JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Hemopet,<br><br>Plaintiff,<br><br>vs.<br><br>Hill's Pet Nutrition, Inc.,<br><br>Defendant | CASE NO. CV 12-01908-JLS (JPRx)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 93)** |

## I. INTRODUCTION

Before the Court is a Motion for Summary Judgment filed by Defendant Hill's Pet Nutrition, Inc. (Mot., Doc. 93.) Plaintiff Hemopet opposed, and Hill's replied. (Docs. 97, 105.) Having read and considered the parties' papers and heard oral argument, the Court GRANTS Defendant's Motion.

## II. BACKGROUND

On November 2, 2012, Hemopet filed a Complaint in this Court against Hill's for patent infringement. (Doc. 1.) On January 16, 2013, Hemopet filed a First Amended Complaint ("FAC"). (Doc. 19.) Hemopet asserts that Hill's has infringed and continues to infringe four patents that Hemopet was assigned and owns. (Id.) After the parties' filed their briefs regarding claim construction, this Court issued its Order on Claim Construction on May 13, 2014. (Order on Claim Construction, Doc. 76.)

On September 18, 2014, Hill's filed a Motion for Summary Judgment. (Doc. 93.) Hill's argues that Hemopet's infringement claims fail as a matter of law because (1) claims 1 and 2 of U.S. Patent No. 7,865,343, claims 1, 2, 9, and 10 of U.S. Patent No. 8,060,354, claim 1 of U.S. Patent 8,234,099, and claims 1 and 8 of U.S. Patent No. 8,224,587 are invalid under 35 U.S.C. § 101; (2) claims 1, 2, 9, and 10 of the '354 patent, claim 1 of the '099 patent, and claims 1 and 8 of the '587 patent are invalid under 35 U.S.C. § 102; (3) claims 1 and 2 of the '343 patent, claims 1, 2, 9, and 10 of the '354 patent, claim 1 of the '099 patent, and claims 1 and 8 of the '587 patent are not infringed; and (4) Hill's acts of using, selling, or offering for sale pet food products, the process that Hill's uses to manufacture pet food products, and Hill's identification of any ingredients prior to the issuance of Hemopet's patents do not infringe claims 1 or 2 of the '343 patent, claims 1, 2, 9, or 10 of the '354 patent, claim 1 of the '099 patent, or claims 1 or 8 of the '587 patent. (Id. at 2.)

The patents at issue all disclose in a similar manner "a method, apparatus and

system of obtaining, analyzing and reporting laboratory test data in relation to the health assessment data of an animal together with the genetic data related to that same animal." '343 patent, col. 2:6-2:9. According to the claims largely shared by the patents, the invention allows the user to "formulate and prepare a nutritional diet product based on the relationship" between "first data relating genomic map data to a physiological condition of the animal" and "second data comprising the effect of nutrition on the expression of at least one gene in the genomic map." '354 patent, col. 25:3-25:12.

Claim 1 of the '343 patent, entitled "Method of Analyzing Nutrition for a Canine or Feline Animal," reads:

> A method of analyzing nutrition for a canine or feline animal, comprising:
> accessing at least one database that comprises first data relating genetic descriptor genomic data to a physiological condition, wherein the genetic descriptor genomic data is obtained from either a bodily fluid or tissue sample;
> accessing second data comprising the effect of nutrition on the expression of the genetic descriptor genomic data;
> analyzing, by use of a computer, the first and second data, relating the effect of nutrition on the expression of the genetic descriptor genomic data for the animal to the physiological condition, wherein the physiological condition comprises gastrointestinal function or immunological function of the animal; and formulating a nutritional diet based on the analyzed data.

'343 patent, col. 23:41-24:4.

Claim 2 of the '343 patent reads:

> The method of claim 1 further comprising preparing a nutritional diet based on the analyzed data.

Id., col. 24:5-24:6.

Claim 1 of the '354 patent, entitled "System and Method for Determining a

3

Nutritional Diet for a Canine or Feline Animal," reads:

> A system for determining a nutritional diet for a canine or feline companion animal comprising:
>
>     a computer;
> at least one electronic database coupled to the computing system;
>     at least one software routine executing on the computing system which is programmed to:
>
>         (a) receive first data relating genomic map data to a physiological condition of the animal, and second data comprising the effect of nutrition on the expression of at least one gene in the genomic map;
>
>         (b) determine a relationship between said first and second data; and
>
>         (c) based on the relationship, determine a nutritional diet for the canine or feline companion animal; and formulate and prepare a nutritional diet product based on the relationship.

'354 patent, col. 24:63-25:11.

Claims 2, 9, and 10 of the '354 patent, though slightly different in structure, disclose the same system and/or method as claim 1 for "determining a nutritional diet for a canine or feline companion animal." Id., col. 25:13-25:31; Id. col. 25:58-26:4; Id. col. 26:5-26:18.

Claim 1 of the '099 patent, entitled "Computer Program for Determining a Nutritional Diet Product for a Canine or Feline Animal," reads:

> A non-transitory computer-readable medium for determining a nutritional diet for a canine or feline companion animal stored thereon instructions for a computer to execute the medium comprising:
>
>     at least one electronic database; and
>
>     at least one software routine comprising instruction for:
>
>         (a) receiving first data relating genomic map data to a physiological

>condition of a canine or feline companion animal, and second data comprising the effect of nutrition on the expression of genes in the genomic map data;
>
>(b) determining a relationship between said first and second data; and preparing a nutritional diet for the canine or feline companion animal based on the relationship.

'099 patent, col. 24:66-25:11.

Claim 1 of the '587 patent, entitled "Method and System for Determining a Nutritional Diet for a Canine or Feline Animal," reads:

>A method for determining a nutritional diet for a canine or feline companion animal comprising the steps of:
>
>(a) receiving first data relating the expression of at least one gene from a genomic map of the animal to a physiological condition of the animal,
>
>(b) receiving second data comprising an effect of nutrition on the expression of least one gene from the genomic map;
>
>(c) determining a relationship between the first and second data using a suitably programmed computer, and
>
>(d) determining a nutritional diet for the animal based on the relationship of said first and second data.

'587 patent, col. 25:46-26:1.

Finally, claim 8 of the '587 patent essentially combines the language of claim 1 of the '354 patent and claim 1 of the '587 patent. Id. col. 26:28-26:42.

In sum, the patents in suit claim (1) an electronic database consisting of data regarding the map of part of the DNA sequence of a cat or dog, (2) an electronic database consisting of the effect of nutrition on the expression of at least one gene from the map of part of the DNA sequence of a cat or dog, (3) utilizing a computer and software routine to determine a relationship between these two databases, and (4) developing, designing, or

making a particular nutrient or caloric composition for a cat or dog.  (*See generally* Order on Claim Construction.)  All of the claims are implemented using a computer and software routine.

The four patents at issue therefore disclose a method and/or system for analyzing and determining a nutritional diet for cats and dogs.  The key inquiry in this case is whether these claims are patent eligible under 35 U.S.C. § 101, or are instead drawn to patent-ineligible abstract ideas.  Hill's argues that these patents are also invalid under 35 U.S.C. § 102 and that Defendant has not infringed the patents.  (*See* Mot.)  However, because the Court finds that all four patents are invalid under 35 U.S.C. § 101, we need not address Defendant's § 102 and non-infringement arguments.

## III.  LEGAL STANDARD

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and quotation marks omitted).  The burden then shifts to

the non-moving party to "cit[e] to particular parts of materials in the record" supporting its assertion that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor").

The burden of establishing patent invalidity or any claim thereof rests with the party asserting such invalidity. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). An invalidity defense must therefore be proved by clear and convincing evidence. *Id.*

**IV.  DISCUSSION**

As noted above, Hill's argues that Hemopet's infringement claims fail as a matter of law because the four patents at issue are invalid under 35 U.S.C. § 101 for claiming ineligible subject matter.

Section 101 of the Patent Act defines the subject matter that is eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101. This section, however, contains important implicit exceptions. "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). The concern that drives these exceptions is preemption; laws of nature, natural phenomena, and abstract ideas are "the basic tools of scientific and technological work" and granting patents based on these exceptions might impede innovation more than it would promote it. Yet, to some extent "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)). "Thus, an invention is not

7

rendered ineligible for patent simply because it involves an abstract concept." *Alice,* 134 S. Ct. at 2354 (citing *Diamond v. Diehr*, 450 U.S. 175, 187 (1981)).

The Supreme Court has analyzed § 101 by distinguishing "between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Alice*, 134 S. Ct. at 2354 (internal quotations and citations omitted). The Supreme Court, in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), set forth a two-step framework for distinguishing between these two types of patents. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, [w]hat else is there in the claims before us?" *Alice*, 134 S. Ct. at 2355 (alteration in original) (quoting *Mayo*, 132 S. Ct. at 1296-97). The second step is essentially "a search for an 'inventive concept' – *i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (alteration in original) (quoting *Mayo*, 132 S. Ct. at 1294). The elements of each claim must therefore be considered both individually and "as an ordered combination." *Mayo*, 132 S. Ct. at 1298 (2012).

### A. Patent-Ineligible Concept

We must first determine whether the claims at issue in Hemopet's four patents are directed to patent-ineligible concepts.

Hill's argues that the claims at issue simply reflect naturally occurring phenomena. Specifically, Hill's argues that the claims "are directed to the abstract concept of determining a nutritional diet for a canine or feline based on naturally occurring relationships between physiological conditions and genomic data and the effect of nutrition on genomic data." (Mot. at 7-8, Doc. 93.) Therefore, Hill's contends the claims simply recite abstract concepts followed by an "apply the law" step. (Mot. at 9.)

8

1    Hemopet responds that the claims at issue "are directed to a new way of developing
2 a dog or cat food, not an abstract concept." (Opp'n. at 4, Doc. 97.) Hemopet relies on the
3 opinions of expert Dr. Nate Sutter in arguing that a novel and tangible creation results from
4 the patent claims: "[T]he Asserted Patents disclose obtaining robust genomic-level data
5 through the use of sophisticated, high throughput techniques, comparing that first data to
6 second data of similar scale reflecting changes as a result of nutrition, and then leveraging
7 the results of that analysis into formulating and preparing a canine or feline nutritional diet
8 or product." (Id.; Opp'n, Ex. 2, 07/17/14 Sutter Report ¶ 103.) Hemopet further contends
9 that the relationship between nutrition and gene expression is induced through human
10 intervention and used to develop a novel nutritional diet or product. (Opp'n at 5.)

11   However, Supreme Court and Federal Circuit precedent is clear that patents which
12 set forth laws of nature or relationships "that exist in principle apart from any human
13 interaction" are not patentable without more. *Mayo*, 132 S. Ct. at 1297. For example, in
14 *Mayo*, the Supreme Court considered whether claims that covered a process that helped
15 doctors who use thiopurine drugs treat patients with autoimmune diseases by determining
16 whether a given dosage level is too high or too low encompassed unpatentable natural laws
17 or patent-eligible applications of those laws. *Id.* at 1294. The court found that "[w]hile it
18 takes a human action (the administration of a thiopurine drug) to trigger a manifestation of
19 this relation in a particular person, the relation itself exists in principle apart from any
20 human action." *Id.* at 1297. As a result, the Supreme Court held that the patent in *Mayo*
21 was invalid because "the claim simply tells doctors to: (1) measure (somehow) the current
22 level of the relevant metabolite, (2) use particular (unpatentable) laws of nature (which the
23 claim sets forth) to calculate the current toxicity/inefficacy limits, and (3) reconsider the
24 drug dosage in light of the law." *Id.* at 1299.

25   Further, in *PerkinElmer, Inc.* v. *Intema Ltd.*, the Federal Circuit addressed a patent
26 that disclosed specific screening methods for estimating the risk of fetal Down's
27 syndrome. 496 F. App'x 65 (2012). One of the representative claims disclosed the
28

9

1 method through the following steps: "[1] measuring the level of at least one screening
2 marker from a first trimester of pregnancy . . . [2] measuring the level of at least one
3 second screening marker from a second trimester of pregnancy…[3] and determining the
4 risk of Down's syndrome by comparing the measured levels of both…with observed
5 relative frequency distributions of marker levels in Down's syndrome pregnancies and in
6 unaffected pregnancies." *Id.* at 67.  The *PerkinElmer* Court found that "an increased risk
7 of fetal Down's syndrome produces certain analytical results is a natural process" and thus
8 the "measuring" and "determining" steps were "insufficient to make the claim patent-
9 eligible because it is well-understood, conventional information." *Id.* at 71.  The Federal
10 Circuit therefore affirmed the district court's holding that "physical data-gathering steps,
11 which may cover patent-eligible subject matter, are insufficient to make claims reciting
12 abstract ideas patent-eligible applications of the ineligible concepts." *Id.* at 72.
13      Hemopet's four patents encompass claims similar to those found in *Mayo* and
14 *PerkinElmer*.  The claims at issue here tell practitioners to: (1) measure and use data
15 relating the map of part of the DNA sequence of the animal to a physiological condition of
16 the animal, (2) measure and use data comprising the effect of nutrition on the expression of
17 at least one gene from the map of part of the DNA sequence of the animal, (3) compare the
18 two sets of data to determine a relationship, and (4) determine, formulate, and prepare a
19 nutritional diet for that animal.  (*See generally* Order on Claim Construction.)  Though
20 different terminology may be used, a similar claim structure is present here as it was in
21 *Mayo* and *PerkinElmer*.  The main addition here that was not present in the claims
22 addressed in *Mayo* and *PerkinElmer* is that the claims in Hemopet's patents go one step
23 further; they include a final step of formulate and prepare a nutritional diet for that animal.
24 Nevertheless, the formulation and preparation of pet food is nothing more than an
25 extension of the abstract idea of "determine" a dog or cat's diet.  The creating or
26 formulating processes directed in the claims are couched in the most general terms, lacking
27 any specifics that would allow a practitioner to learn how to actually develop or produce
28

10

such a diet. *See Alice*, 134 S. Ct. at 2359-2360 (explaining that the claims at issue were not patent-eligible because the "system and media claims add nothing of substance to the underlying abstract idea"). Therefore, all of the claims are squarely within the realm of "abstract ideas" as defined by the Supreme Court.

The Court therefore agrees with Hill's that the claims at issue encompass the abstract concept of determining a nutritional diet for a dog or cat based on naturally occurring relationships. We therefore turn to the second step of *Mayo*'s framework to determine whether directing in general terms the development and design of a particular nutrient or caloric composition for a dog or cat transforms the abstract idea into something patent-eligible. (*See* Order on Claim Construction at 14-15.)

### B. Inventive Concept

The second step of *Mayo*'s framework involves examining "the elements of the claim to determine whether it contain[s] an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application. *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1298). Claims "are not patentable unless they have additional features that provide practical assurance that the processes are genuine applications of those laws rather than drafting efforts designed to monopolize the correlations." *Mayo*, 132 S. Ct. at 1291. "[T]o transform an unpatentable law of nature into a patent-eligible application of such a law, a patent must do more than simply state the law of nature while adding the words 'apply it.'" *Mayo*, 132 S. Ct. at 1290 (citing *Gottschalk v. Benson*, 409 U.S. 63 (1972)). "The introduction of a computer into the claims does not alter the analysis at *Mayo* step two." *Alice*, 134 S. Ct. at 2357.

Hill's argues that the patent claims at issue simply describe naturally occurring phenomena or recite abstract ideas "with no detail or explanation of how to determine the relationship, determine the content or formulate the diet." (Mot. at 9.) For example, Hill's contends that Claim 2 of the '354 patent, representative of all four of Hemopet's patents, is

1  simply comprised of two steps (a) and (b), which are directed to receiving two sets of data
2  that are naturally occurring, step (c), which is directed to determining a relationship
3  between the two sets of data, and step (d), which is a general direction to determine and
4  formulate a nutritional diet without any detail concerning how to perform this final step.
5  (Mot. at 11-12.)  Hill's argues that the computer, electronic databases, and software
6  routines described in the claims are "purely functional and generic" and do not provide "a
7  meaningful limitation beyond generally linking the use of the method to a particular
8  technological environment."  (Mot. at 14.)

9  Hemopet argues in opposition that "the claimed invention incorporates the notion
10 that nutrition can influence gene expression" and "applies these ideas in a practical,
11 tangible way by transforming information and raw materials into a nutritional diet product
12 designed to induce specific gene expression in a pet."  (Opp'n at 6.)  Hemopet once again
13 relies on the opinion of Dr. Sutter to contend that the last step "of taking the resulting
14 information from the analysis performed on the data sets and using it to develop and
15 design, or create, or determine what nutrients or caloric compositions should be used in a
16 food product is a key part of the novelty of the invention."  (Id.; Opp'n, Ex. 2 at ¶ 112.)

17 The Court agrees with Hemopet that this final step in the claims, creating a
18 nutritional product for dogs or cats, is an additional step not found in previous claims the
19 Supreme Court has addressed.  *See Alice*, 134 S. Ct. 2347; *Mayo*, 132 S. Ct. 1289;
20 *PerkinElmer*, 496 F. App'x 65.  However, the Court finds Hill's to be correct that this step
21 is nothing more than a general "apply it" step that does not transform an otherwise
22 ineligible-patent concept into a patentable invention.  For that reason, Hemopet's reliance
23 on *Diehr* misses the mark.

24 In *Diehr*, the Supreme Court addressed a claimed process for molding raw, uncured
25 synthetic rubber into cured precision products.  *Diehr*, 450 U.S. at 177.  The claims
26 described a process where a mold is used "for precisely shaping the uncured material under
27 heat and pressure[,]" whereby synthetic rubber is then created by curing it in the mold so
28

that the product would "retain its shape and be functionally operative after the molding is completed." *Id*. The Court found that the specifically claimed physical and chemical process for molding precision synthetic rubber products satisfied § 101 as possibly patentable subject matter because the claims "involve the transformation of an article, in this case raw, uncured synthetic rubber, into a different state or thing." *Id.* at 184. Because the "claims describe in detail a step-by-step method for accomplishing such, beginning with the loading of a mold with raw, uncured rubber and ending with the eventual opening of the press at the conclusion of the cure," the *Diehr* Court found that the patent set forth an industrial process of the type that has historically been protected by our patent laws. *Id.*

However, here, claim 1 of the representative '354 patent recites "measuring" and "determining" steps that the Supreme Court and Federal Circuit have found to be patent ineligible. *See Alice*, 134 S. Ct. 2347; *Mayo*, 132 S. Ct. 1289; *PerkinElmer*, 496 F. App'x 65. Only the final step, "determine a nutritional diet for the canine or feline companion animal; and formulate and prepare a nutritional diet product based on the relationship," relates to the creation of a "different state or thing." However, whether considered individually or in combination with the other steps, the claims do nothing more than instruct the practitioner to implement the abstract ideas of the first few unpatentable steps in the final step. "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable…." Mayo, 132 S. Ct. at 1292 (2012). This is nothing more than telling the practitioner to "apply it" in general terms. Hemopet's claims do not describe in detail a step-by-step method for developing a nutritional diet product. *Diehr* therefore does not control here.

Hemopet also relies on the opinion of Dr. Sutter to argue that the necessary "inventive concept" is included in the claims through the use of computers, databases, and software: "The inventive concept here pertains to the integration of this data into

13

something more–the collection and storage of raw data in a computer using databases that identify the relationships within the two data sets of the invention…. Using databases to parse and organize the raw data into these sets allows the practitioner to eventually, as described in the next step, integrate the sets even further to identify new relationships with a level of scientific and statistical reliability previously unachievable using other systems." (Opp'n at 6; Opp'n, Ex. 2 at ¶ 106.) However, the functions performed by the computer, database, or software routine at each step of Hemopet's process are "well-understood, routine, conventional activity, previously engaged in by those in the field." *Mayo*, 132 S. Ct. at 1292; *see Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not."); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed.Cir.2010) ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations."). Dr. Sutter may be correct that "[a]nalyzing the relationships as disclosed in the invention is not merely a matter of comparing column A with column B in a simple 10 row spreadsheet," but measuring, storing, parsing, organizing, and analyzing the relationships of data are basic functions of a computer and database-related software. (Opp'n, Ex. 2 at ¶ 107.); *see Alice*, 134 S. Ct. at 2358 ("mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention"); *Bancorp*, 687 F.3d at 1278 ("The computer required by some of Bancorp's claims is employed only for its most basic function, the performance of repetitive calculations, and as such does not impose meaningful limits on the scope of those claims."). "In other words, the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept

1 into a patent-eligible system or method." *Accenture Global Servs., GmbH v. Guidewire
2 Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013). Hemopet's collection and storage of
3 raw data in a computer using databases that identify the relationships between the two data
4 sets therefore does not transform patent-ineligible claims into something valid under § 101.
5 (*See* Mot., Ex. 18, 4/12/12 Giger Decl. at ¶ 14.) ("The analysis, selection, design and
6 development is not complex, once the datasets are processed, which would likely have
7 been quite straightforward for data analysts.") Even when viewed as an "ordered
8 combination," the claims simply recite the abstract concept of determining a nutritional
9 diet for a dog or cat based on naturally occurring relationships and fail to include any
10 express language to define how the nutritional diet is actually formulated, developed, or
11 produced.

12 Hemopet finally contends that the claims are limited to formulating or preparing a
13 nutritional diet product or diet and therefore the preemption concerns inherent in § 101 are
14 not at issue in this case. (Opp'n at 9-11.) However, "the prohibition against patenting
15 abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a
16 particular technological environment' or adding 'insignificant postsolution activity.'"
17 *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010) (quoting *Diamond v. Diehr*, 450 U.S. 175,
18 191–192 (1981)). Therefore, the last step of the claims directing the practitioner to create,
19 develop, or formulate a nutritional diet for a cat or dog based on previous electronic data
20 collection and analysis does not change the Court's conclusion that the patents are invalid
21 under § 101. *See Bancorp*, 687 F.3d at 1280 (explaining that "*Flook* established that
22 limiting an abstract idea to one field of use or adding token post-solution components did
23 not make the concept patentable") (quoting *Bilski*, 130 S. Ct. at 3231). Under Supreme
24 Court precedent, this "limitation" is simply not enough to transform the abstract idea
25 inherent in the claims into a patent-eligible invention.

26 For these reasons, the Court finds that the claims at issue are drawn to a patent-
27 ineligible abstract idea. Summary judgment is therefore GRANTED because claims 1 and
28

2 of U.S. Patent No. 7,865,343, claims 1, 2, 9, and 10 of U.S. Patent No. 8,060,354, claim 1 of U.S. Patent 8,234,099, and claims 1 and 8 of U.S. Patent No. 8,224,587 are invalid under 35 U.S.C. § 101.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion is GRANTED. Defendant is directed to submit a proposed judgment forthwith.

DATED:  November 24, 2014

JOSEPHINE L. STATON
_____
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE